## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>POOLS & SPAS UNLIMITED, INC.<br><br>Debtor. | Chapter 11<br><br>Case No. 11-13660 |

## DECLARATION OF KATHLEEN A. COPPENS
## IN SUPPORT OF INITIAL PLEADINGS AND EMERGENCY RELIEF

Kathleen A. Coppens hereby deposes and states:

1.      I am the Vice President, Secretary and Treasurer of Pools & Spas Unlimited, Inc. (the "Debtor"), a business entity incorporated under the laws of the state of Delaware, and the debtor and debtor in possession in the above-captioned case.  In this capacity, I am familiar with the Debtor's day-to-day operations, assets, financial condition, books and records, and business affairs.

2.      On November 16, 2011 (the "Petition Date"), the Debtor commenced this reorganization case by filing a voluntary petition for relief under title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").

3.      I submit this declaration (the "Declaration") in support of the Debtor's voluntary petition for reorganization under chapter 11 of the Bankruptcy Code and the relief sought in the various applications and motions filed concurrently therewith (the "Initial Pleadings").[1]  Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge, my review of relevant documents, or my opinion based upon my experience and knowledge of

---

[1] Any capitalized terms not expressly defined herein shall have the meanings given to them in the applicable Initial Pleading

the Debtor's operations and financial condition.  If I were called upon to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, review of documents, or opinion.

4.     I am authorized to submit this Declaration on behalf of the Debtor.

5.     Part I of this Declaration describes the Debtor's business, primary liabilities, and the circumstances giving rise to the commencement of this chapter 11 case.  Part II of this Declaration sets forth relevant facts in support of each of the Initial Pleadings.

## I. BACKGROUND

A.   The Debtor's Business

6.     The Debtor was formed in 1995 for the purpose of purchasing the existing operations of Joe Ordini's Pools and, over time, began operating a full-service pool and spa retail and service center in Middletown, Delaware (the "Middletown Store") and Wilmington, Delaware (the "Wilmington Store").  Prior to the Petition Date, the Debtor closed the Wilmington Store and consolidated its operations into the Middletown Store.  The Debtor's retail operations include, without limitation, the sale of pool and spa equipment, accessories, chemicals, patio furniture, and gazebos.  The Debtor also offers pool and spa installation services using its own employees or, depending on the size of the project, subcontractors.  In furtherance of these services, the Debtor receives deposits and performs the installations pursuant to a contract with the customer.  In addition, the Debtor maintains one of the area's largest parts and service departments in this industry.  Finally, the Debtor offers free water testing to its customers and, twice annually, hosts a free pool seminar.

7.     Although the Debtor's business is largely seasonal (March to October), it has recently been exploring the possibility of expanding its operations to include the retail, installation, and service of pellet stoves to supplement its off-season business.

8.     The Debtor is a C-corporation with two shareholders.  I own 50% of the equity interests and my husband, Charles J. Coppens, owns 50% of the equity interests.  My husband and I (collectively, the "Principals") are also the sole directors and officers of the Debtor.  I serve as Vice President, Secretary, and Treasurer and my husband serves as President.

9.     I am responsible for managing the Debtor's books and records, including, with the assistance of a bookkeeper, collecting revenue, managing customer deposits, and payments to creditors.  The Debtor also employs approximately twelve (12) individuals on a seasonal basis in positions such as managers, laborers, technicians, warehouse workers, cashiers, and general office workers.

## B.  The Debtor's Primary Liabilities

10.     As of the Petition Date, the Debtor is obligated to Artisans Bank ("Artisans") under business loan no. 66-3498, which provides for a business loan in the original principal amount of $225,000.00 (as amended or modified, the "Artisans Loan Documents").  Under the Artisans Loan Documents, Artisans is secured by substantially all of the Debtor's assets and is further secured by the Middletown Store and the Principals' primary residence in Middletown, Delaware.  In addition, Artisans holds a mortgage, in the approximate amount of $1.2 million, on the real estate that is the location of the Middletown Store (the "Artisans Mortgage").  The Debtor is a guarantor of the Artisans Mortgage.

11.     As of the Petition Date, the Debtor is also obligated to The Centreville National Bank (f/k/a The Felton Bank) ("CNB") under two (2) business loans: loan no. 104181960, which

provides for a business loan in the original principal amount of $405,000.00, and loan no. 104181969, which provides for a business loan in the original principal amount of $625,000.00 (collectively, as amended or modified, the "CNB Loan Documents"). Under the CNB Loan Documents, CNB is secured by substantially all of the Debtor's assets, second to Artisans, and is further secured in certain real property in Newark, Delaware owned by the Principals, but not by the Debtor.

12.    As of the Petition Date, the Debtor's unsecured liabilities are approximately $1,250,000, primarily related to trade debt.

C.  Events Leading Up to the Debtor's Chapter 11 Filing

13.    The Debtor has historically operated at a profit; however, beginning in 2008 and continuing through 2011, the nationwide economic recession resulted in a significant decline in the consumer purchase of non-essential, recreation goods, such as pools and spas. Moreover, the economic recession has caused a general rise in manufacturing costs of equipment, materials, and supplies which are essential to the Debtor's operations, as well as increased costs in the construction arena, upon which the Debtor relies for pool installations. Finally, as a seasonal business, the Debtor's operations were hampered by (a) the particularly severe winter weather in this region during late 2010 and early 2011, which resulted in delays to the start of the season due to frozen ground, and (b) the unusually rainy summer and fall in 2011, which resulted in a significant loss of workdays.

14.    It is my belief that the Debtor is a profitable company and capable of being reorganized provided that its debt could be restructured in such a way as to be fair to all creditors and avoid the shutdown of the company's operations. I believe that there is sufficient ability to generate revenue going forward so that the business can be operated at a profit once again. Thus,

I determined that a bankruptcy filing was necessary to give the Debtor an opportunity to reorganize.

## II.  INITIAL PLEADINGS

15.      Concurrently with the filing of this Chapter 11 case, the Debtor will be filing a number of Initial Pleadings. I have reviewed each of the Initial Pleadings, including the exhibits thereto, and I believe that the relief sought in each of the Initial Pleadings is tailored to meet the goals of the Debtor in filing its reorganization case and, ultimately, will be critical to the Debtor's ability to achieve a successful reorganization.

A.  Employee Wage Motion

16.      The Debtor seeks the authority to pay pre-petition debts owed for wages on behalf of its employees.  As of the Petition Date, the Debtor employed approximately twelve individuals.  The employees consist of managers, laborers, technicians, warehouse workers, cashiers, and general office workers (i.e., bookkeeping).

17.      Prior to the Petition Date, in accordance with its ordinary business practices, the Debtor's employees were owed or had accrued various sums for wages or other compensation in the performance of their services.  The Debtor also remains obligated to pay federal, state, and local withholding taxes due on pre-petition employee wages.

18.      The Debtor believes that each of these employees is essential to its reorganization efforts.  The uninterrupted service of the employees is vital to the Debtor's ongoing business operations and its ability to reorganize.  Moreover, a failure to pay accrued wages, or even a delay in such payment, would have a significant negative impact on employee morale.  Without the loyal employees who know and understand the Debtor's business, operations will be hindered, as would the Debtor's reorganization process.

19.     The Debtor believes that without the relief requested, employees would be faced with significant hardship.  The Debtor's employees could not reasonably be expected to continue their employment and assist with the Debtor's reorganization efforts while at the same time enduring financial difficulties.  The Debtor believes that the requested relief will enable it to maintain its current operations without interruption, thereby preserving the value of its business.  In addition, without the relief requested, the Debtor's ability to preserve the assets of its estate for the benefit of all creditors will be impaired and its reorganization efforts may be thwarted.

20.     The Debtor believes that, as of the Petition Date, it owes no more than approximately $15,000 in pre-petition wages and related taxes for its employees.

B.  Customer Practices Motion

21.     The Debtor seeks entry of an order authorizing the Debtor to maintain and administer the Customer Programs (as defined in the Customer Programs Motion) and to honor, in the ordinary course of business, approximately $55,000 in pre-petition commitments owing on account of the Customer Programs, including Customer Deposits, Customer Credit and Refund Policies, and Warranties.

22.     The Debtor desires to continue the Customer Programs post-petition and to honor any and all obligations related to the Customer Programs which arise pre-petition (the "Pre-petition Customer Obligations").  The Debtor believes the Customer Programs are beneficial and critical to its business' transition into Chapter 11 and the preservation of value of its estate.  Thus the Debtor seeks this Court's authority to honor, in its discretion, Pre-petition Customer Obligations.

23.     Thus, to prevent immediate and irreparable harm to the Debtor's customer base, I believe that the relief requested in the Customer Programs Motion is in the best interests of the

Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to continue to operate its businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtor, I respectfully submit that the relief requested in the Customer Programs Motion should be granted.

C. Critical Vendor Motion

24.     The Debtor seeks the authority to pay the pre-petition claim (the "Critical Vendor Claim") of Watkins Manufacturing Corporation (the "Critical Vendor"), a vendor critical to the Debtor's operations, in accordance with the Debtor's pre-petition practices with the Critical Vendor (the "Pre-Petition Trade Terms).

25.     Specifically, the Critical Vendor manufactures and distributes the Hot Springs® brand of spas (the "Spas"). The Debtor is the exclusive retailer of the Spas in the State of Delaware. Moreover, the Debtor's business relies on the servicing and maintenance of the Spas using specific parts available only through the Critical Vendor.

26.     The Debtor estimates that, as of the Petition Date, the total outstanding amount owed to the Critical Vendor is approximately $54,874.00 (the "Critical Vendor Claim"). The Critical Vendor Claim is not a secured claim. Prior to the Petition Date, in furtherance of satisfying the Critical Vendor Claim, the Debtor and the Critical Vendor agreed that, for every Spa sold, the Debtor would pay the Critical Vendor an additional one thousand dollars ($1,000.00) on top of the amount otherwise due by the Debtor (the "Pre-Petition Trade Terms").

27.     The Debtor believes that payment of the Critical Vendor Claim in accordance with the Pre-Petition Trade Terms, as described above, is truly essential as the Debtor is the sole retailer of the Spas in Delaware and the Critical Vendor is the sole manufacturer and distributor of the Spas, thus rendering it impossible to find a replacement vendor for the Critical Vendor.

Further, any interruption or delay in the Debtor's business and operations or interruption or delay in the Debtor's business relationship with the Critical Vendor would likely result in loss of revenues and customers and may necessitate a shutdown of the Debtor's operations.

D.  Cash Collateral Motion

28.    In order to fund this bankruptcy case, the Debtor proposes to use any cash generated in its business, including any cash in its possession on the Petition Date and any receivables obtained in the operation of its business.  This cash collateral may be secured by the terms of the Artisans Loan Documents and the CNB Loan Documents.  The use of cash collateral, however, will allow the Debtor to continue operations for the benefit of all creditors, including Artisans and CNB (collectively, the "Lenders").

29.    The Lenders will be adequately protected for the Debtor's use of cash collateral in that the Debtor proposes to grant the Lenders replacement liens in the Debtor's post-petition assets to the extent of the Lenders' secured position as of the Petition Date.  The replacement liens and security interests would be limited to the extent of any diminution in the value of the pre-petition collateral by virtue of the Debtor's use of cash collateral.

30.    It is imperative that the Debtor be permitted to use cash collateral in order to continue managing the business and to achieve reorganization.  Absent use of cash collateral, the Debtor would have no working capital with which to meet ongoing obligations to employees and other creditors.  If the Debtor is unable to pay these obligations as they come due, the Debtor will be severely hampered from adequately operating its business to the detriment of its estate and creditors.

31.    Absent the operational financing that the use of cash collateral provides, the Debtor would be forced to shut down its operations, causing immediate and irreparable harm to

its creditors.  A shut down of the operations would also result in loss of jobs for employees and the inability of the Debtor to reorganize.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

POOLS & SPAS UNLIMITED, INC.

Dated: November _16_, 2011                    by: _Kathleen Coppens_

Kathleen A. Coppens, Vice President, Secretary and Treasurer of the Debtor